IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LEE ELDER, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:10-cv-246-MEF |
| | ) | |
| D & J ENTERPRISES, INC., | ) | |
| | ) | (WO-Do Not Publish) |
| DEFENDANT. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Lee Elder ("Elder") brings suit against his former employer D&J Enterprises, Inc. ("D&J") for alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. This cause, which brings to mind the classic line from *Cool Hand Luke*, "What we've got here is a failure to communicate." Pending before this Court is Defendant's Motion for Summary Judgment (Doc. # 11). For the reasons set forth below, the motion is due to be DENIED.

## JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over Elder's FMLA claims pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 2617(a)(2). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations supporting both.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), "a party may move for summary judgment, identifying each claim or defense — or the part of each claim of defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). A court presented with such a motion must grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A genuine dispute as to a material fact can only be found "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). According to the Supreme Court, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. *See also* Fed. R. Civ. P. 56(c)(1).

After the movant satisfies this requirement, the burden shifts to "the adverse party [who] must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quotation omitted). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment." *Id.* at 247-48.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The Eleventh Circuit Court of Appeals has held that "[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable." *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir. 1985) (citation omitted).

## FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts:

**A.  Elder's Diagnosis**

During the three years prior to his employment with D&J, Elder began to experience symptoms such as swelling in his feet.  He saw a two or three doctors.  They each diagnosed him with Rheumatoid Arthritis and gave him medication for it.  Eventually, he began seeing Dr. Massey in March of 2004.  She confirmed his diagnosis with Rheumatoid Arthritis and began a course of treatment which provided him some relief.  According to Dr. Massey, who continues to be Elder's primary physician for this condition, the condition is chronic, in that no cure for this disease exists, and episodic, in that symptoms would come and go and vary in severity.  Periods of increased disease activity are commonly referred to as "flare ups."

Because of his diagnosis, Elder was not interested in a long haul trucking position and instead sought a position with D&J driving a truck locally.  He was taking prescription medications for this condition, but at the time of his hiring with D&J, Elder did not disclose that he had this ailment.  Nor did Elder mention that he suffered from this condition or that he needed medical treatment for this condition when he applied for employment with D&J.

**B.  Elder's Employment with D&J**

**1.  Overview of D&J's business**

D&J is a contractor and services company in Auburn, Alabama.  D&J employs about two hundred people.  D&J employs drivers to operate a variety of trucks to hauls materials for clients on a regular basis.  D&J operates three types of trucks: dump trucks, dump trailers, and roll-off trucks.  D&J employs twenty-five to thirty truck drivers and assigns its drivers to a specific truck.

**2.  D&J's policies regarding attendance and FMLA leave**

In the fall of 2009, the D&J employee handbook did not have any information in it regarding FMLA leave.  Moreover, it is undisputed that Elder did not receive an employee handbook at any time during his employment with D&J.  In the fall of 2009, the only attempt D&J made to articulate a policy regarding FMLA leave was to hang a commercial produced poster in the shop and in the main office.  This poster is not in the record, but according to the testimony before the Court it contained wage and hour information and a general statement that employees who have been in the workplace for a year are entitled to a twelve-

week leaver without pay for medical problems of their own or members of their family or relating to "maternity."  Elder recalls seeing the poster in the break room with some information about the FMLA and other employment related legal issues on it.

On March 17, 2009, D&J had Elder sign a form acknowledging that he had read and understood D&J's "Absence & Termination Policy" which stated that it was a driver's responsibility to notify his dispatcher if he was going to be absent from work and that the failure to notify the dispatcher of an absence due to illness or a death in the family within 24 hours will be deemed as a voluntary quit.  It also provided that failure to notify the dispatcher of an absence within 24 hours of a driver's last dispatch will result in termination of employment.

At least with respect to Elder, it does not appear that D&J had historically enforced this policy as it was written.  Moreover, on its face, the policy does not address whether it applies when an employee is on a qualified FMLA leave.  According to Elder, he had no instructions from anyone at D&J regarding what he was supposed to do about reporting his absences while on FMLA leave.

### 3.  D&J hires Elder

On December 10, 2003, D&J hired Elder as a local truck driver in the cement and gravel department.  During his employment with D&J, Elder operated a frameless dump trailer that was used to transport sand from a pit in Shorter, Alabama to a concrete company. Operation of a frameless dump trailer requires greater skill than operating a regular dump

truck because it lifts up on its back wheels approximately forty feet in the air and can easily turn over if it is not properly level.  During Elder's employment, D&J owned and operated two frameless dump trailers.

### 4.  Elder discloses his need for treatment to D&J

In approximately 2004 or 2005, when the treatment for Elder's condition changed from oral medications to intravenous treatment which required him to miss work for several hours, Elder told his supervisor at D&J, Lynn Tapley ("Tapley"), about his diagnosis and the need for time off to receive periodic intravenous treatments at his doctor's office.  Tapley told Elder that it was okay for him to take time off to get the treatment, but to make sure that he told Tapley in advance.  Elder needed these intravenous treatments about every six weeks. Elder also needed to have blood work done on a periodic basis.

### 5.  Elder's attendance problems prior to the events leading to the termination of his employment

Despite having acknowledged seeing the D&J's "Absence & Termination Policy," Elder received a written warning on April 6, 2009 after he failed to come in or call for three days in a row.  According to Elder, his Rheumatoid Arthritis caused him to miss work during this time.

### 6.  Events in September and October of 2009 resulting in termination of Elder's employment

By September of 2009, Tapley was required to have blood work done by Dr. Massey's

office every three months, and every six months he would see Dr. Massey.  Elder could not get his medicine until after his blood work was completed.  After working a full shift on Monday, September 14, 2009, Elder told Tapley he needed to go to a doctor's appointment the following day.  Elder believes that this must have been one of his appointments for blood work rather than one of the appointments when he saw Dr. Massey.  Elder did not go to work on September 15, 2009, nor did he call in.  On September 16, 2009, Elder called D&J at 6:30 a.m. and stated he was having a test in Montgomery.  He did not work on that day.  On September 17, 2009, Elder called D&J in the afternoon to ask for D&J's fax number.  Elder did not report to work or call in on September 19, 2009.  The next week, Elder worked as scheduled each day (September 21 through September 25).

At some point after Elder's blood work, he learned from Dr. Massey's office that there was a problem with his blood work.  The blood work had to be repeated a second time.  Then, the doctor wanted more tests including a sonogram by a specialist in Montgomery.  While these tests were being completed, the doctor was not renewing Elder's prescription for the medicine which Elder took for his Rheumatoid Arthritis.  A known side-effect of that medicine can be liver problems and so Elder's liver function was carefully monitored as part of his regular blood work.

On Monday September 28, 2009, Elder did not come to work.  Elder did not contact Tapley regarding this absence, but Elder's wife called Judy Harrell ("Harrell")[1] at D&J and

---

[1]  Harrell is D&J's payroll clerk.

requested that she send an FMLA medical certification compliance form to Elder's treating physician, Dr. Massey. Elder's wife provided Harrell with Dr. Massey's fax number. Harrell told Elder's wife that Elder would have to discuss FMLA leave with Tapley.

After speaking to Elder's wife, Harrell sent an email message to Tapley. She told him that Elder's wife had called and that Elder would be speaking to Tapley about FMLA leave. Harrell explained that Elder is allowed twelve weeks per year of unpaid leave for illness. She speculated that he was having some health issues and will be needing some time off. It is clear from a later email message that Harrell did not know what Elder's condition was. She advised Tapley that the law required him to be allowed to take the time off. Tapley responded to Harrell in an email which stated:

> He would be one of the 1st I would lay off this is not good he has been out more this year than I have since been employed. is there any legal way to handle this both dick and jimmy have been on me about him but I make him bring a doctors slip every time but that's really not a problem his wife is a nurse she just fills one out lol.

Doc. # 21 (errors in original). In response, Harrell provided Tapley with further clarification about the requirements of the FMLA. On September 29, 2009, Elder was again absent from work and did not call Tapley.

On September 30, 2009, Elder came to work to talk to Tapley.[2] He said he had been

---

[2] Elder's testimony, while it is not entirely clear as to date, seems to put this conversation on October 2, 2009. For purposes of this motion, the Court must view the evidence in the light most favorable to Elder. In this instance that means crediting the evidence in the record that indicates that he talked to Tapley about his need for FMLA leave on September 30, 2009, the earlier of the two possible dates.

sick and he wanted to take FMLA leave.  During Elder's meeting with Tapley, Elder told him that he needed to be out to take a test the next day in Montgomery.   Elder said that he would let Tapley know the results as soon as he knew something.  According to Elder, Tapley read to him from a piece of paper[3] and said that he needed to know what was wrong with Elder, how long he was going to be out, and a certification to come back to work.  Elder states that during this conversation with Tapley, Elder explained that he could not take his medicine for his Rheumatoid Arthritis until after all of the testing ascertained whether his liver was being damaged.

Elder testified at his deposition that he was sick during this time because he did not have his medicine.  He stated that he "wasn't in any mood to work" because he was sick.  He admits that while the flare ups of his Rheumatoid Arthritis were minor he could have worked but that it would have been difficult.

On October 1, 2009, Elder saw Dr. Abrams, a liver specialist.  Dr. Abrams ordered a sonogram test which Elder had on October 5, 2009.  Unknown to Elder, Dr. Abrams' office faxed a "Certificate to Return to Work/School" date October 5, 2009.  According to this document, Elder was "under [Dr. Abrams'] care from 10-1-09 to 10-6-09 and will be able to return to work ... on 10-6-09."  D&J received this document via facsimile transmission on October 6, 2009.

On October 2, 2009, Dr. Massey completed a Certification of Health Care Provider

---

[3]  It is undisputed that Tapley had no training in FMLA administration.

for Employee's Serious Health Condition (Family and Medical Leave Act) form on Elder. (Doc. # 11).  On this form Dr. Massey indicated that Elder's condition began in March of 2004 and would be of indefinite duration.   She also indicated she had treated Elder for this condition from March of 2004 through that date.  Dr. Massey indicated that Elder was unable to perform any of his job functions due to his condition and added to this response by stating that "[p]atient maybe limited at times due to Rheumatoid Arthritis." when asked to identify the job functions the employee was unable to perform.  Dr. Massey indicated that Elder would be required to have appointments for treatment and follow-up visits and that there may be times when he is unable to work due to his Rheumatoid Arthritis.   As to the period of his incapacity, Dr. Massey stated that it could not be determined until Elder had flare ups, the timing of which could not be determined in advance.  Dr. Massey stated on more than one place on the form that Elder may need to be out of work during flare-ups.  Dr. Massey's office faxed this form to D&J.

Harrell did not believe that she could deny FMLA leave.  She was under the impression that once she received the Certification from Dr. Massey on October 2, 2009, Elder's request for FMLA leave was approved.  Harrell understood that Elder's request was for intermittent leave.

On October 5, 2009, apparently the same day that Elder had his sonogram performed, a CMA in the employ of Dr. Abrams completed a "Certificate to Return to Work/School" for Elder.  It indicated that Elder had been under Dr. Abrams' care from October 1, 2009 to

October 6, 2009.  It also indicated that Elder would be able to return to work on October 6, 2009 without any limitations indicated.  This document was faxed to D&J sometime between October 4, 2009 or October 7, 2009.[4]

According to Elder,[5] he stopped to see Tapley at work on October 6, 2009.[6]  Elder told Tapley that he did not have the results of the sonogram yet.  Elder told Tapley that he was worried about it and that he did not know what they would find with that test.  Elder was emotionally upset and felt too upset to drive the truck.  According to Elder, he told Tapley this.  During this conversation, Elder contends that Tapley tried to tell him he should take all twelve weeks of the FMLA leave rather than trying to take intermittent leave.  That was not what Elder wanted to do and he said so.  Elder told Tapley that once he had the test results and could get back on his medicine he wanted to come back to work and Tapley said "Okay."  As a result of this conversation, Elder thought he did not need to call in to work each day he was out because he had already told Tapley he needed FMLA leave for an unknown period of time and that once he was better he would be back to work.

---

[4]  The testimony is not clear on this point.  Tapley received the fax and believes he received it on October 6 or 7, but the fax bears a time date stamp indicating it was faxed on October 4, the Sunday before it was actually dated.  Elder knew nothing of this return to work's contents until much later and cannot offer any testimony to more clearly establish the date.  Given that the Court must view the evidence in the light most favorable to Tapley for this motion, the Court will assume that Tapley did not receive the fax until October 7, 2009.

[5]  Tapley disputes that this conversation occurred.

[6]  According to the testimony the conversation was the day after the sonogram test.

Approximately two days later, Elder learned the results of the sonogram.[7]  This meant that he was no longer worried and upset, but he was sick with a flare up from having been off his medicine.[8]  Elder testified that he was not able to get back on his medicine until November.

On October 6, 2009, Harrell wrote to Tapley regarding Elder.  She told him that she had spoken to D&J's attorney and learned that Elder does qualify for FMLA leave and that the doctor's statement makes it possible for Elder to take it intermittently rather than all at once.  Harrell told Tapley that Elder would be required to let Tapley know every time he is out if it is to be applied to his FMLA.  Harrell indicated that she would be writing to Elder about his BCBS insurance premium so he would not lose coverage while on leave and that she would be writing to Elder's doctor to learn if he was limited with respect to what he could perform when he did come to work.

Harrell faxed a letter to Dr. Massey on October 6, 2009 seeking further information relating to the previously submitted Certification of Health care Provider for Employee's Serious Health Condition.  Harrell described the requirements of Elder's job and asked Dr. Massey to explain whether her prior statement that Eder was "limited at times due to Rheumatoid Arthritis" meant that Elder would not be able to perform some or any of his job

---

[7]  Elder seems confused about this date.  Some points in his testimony he says he got the results two days after the test (October 7), other points he says he got the results on the 5th, or the 8th, and he also says that he didn't get the results until the 12th.

[8]  Elder experienced nausea, joint pain, trouble moving, and trouble putting his shoes on.

functions at any given time while at work or if she was referring to his need to be off and in

ability to perform those functions during a flare up.

On October 7, 2009, an employee of Dr. Massey sent a fax to D&J with the following

response to Harrell's queries:

> with Rheumatoid Arthritis it may be difficult for the patient to perform the
> above listed duties during the flare up times and he may possibly have to be
> out of work during these times.  Rheumatoid Arthritis may affect physical
> abilities during flare ups and can cause pain, swelling, and stiffness which may
> make physical duties difficult.

(Doc. # 21).

On the afternoon of October 12, 2009, Elder called Tapley to tell him that he planned

to come to work the next day, Tuesday, October 13, 2009.  It is undisputed that during this

call, Tapley told Elder that his employment with D&J was terminated.  Tapley contends that

he made this decision without consulting the owners of D&J, which was within his

authority.[9]  Elder contends that Tapley said that Dick Starr, one of the owners, had told

Tapley to fire Elder.[10]  Elder also contends that during this phone conversation, Tapley said

that he had a form from a doctor that said that Elder should have been back to work on

---

[9]  There is evidence that a few days prior to this telephone conversation, Tapley had asked
Harrell if he could terminate Elder's employment.  After conferring with legal counsel, Harrell told
Tapley that he could terminate Elder's employment.  Tapley appears to deny this, but Harrell testified
to this fact.

[10]  It is not disputed that Tapley had the authority to make the decision to terminate Elder's
employment without consulting with the owners of D&J, but it is disputed whether Tapley said Dick
Starr made the decision.

13

October 6.[11]   Elder assumed this was from Dr. Abrams, and he told Tapley that was not his "original doctor" but a specialist that Elder had seen once for only fifteen minutes.  Elder explained that he could not have come to work on October 6 because he was still sick and had not gotten his medicine at that time.  Before ending the telephone call, Elder told Tapley he was going to fax him the medical certification from Dr. Massey.

After the call with Tapley ended, Elder faxed a medical certification form from Dr. Massey to Tapley.  Elder tried to call Tapley to discuss the matter, but Tapley would not speak to him.

**7.  After the Termination of Elder's Employment**

An employee of D&J cleaned out Elder's personal belongings from the truck and gave them to Elder.  After the termination of Elder's employment he unsuccessfully applied for unemployment benefits from the Alabama Department of Industrial Relations.  The application was denied because the agency determined that Elder had abandoned his job by failing to show up for work after being released to work on October 6, 2009.

On March 18, 2010, Elder filed this lawsuit.  In the suit, he alleges violations of the FMLA in the form of interference by failure to designate qualified absences as FMLA leave and denial of leave as well as retaliation against Elder for availing himself of rights under the FMLA.  He seeks a declaration that D&J violated the FMLA, reinstatement, back-pay and benefits, liquidated damages, a permanent injunction, costs, expenses, and attorney's fees.

---

[11]   Indeed Tapley's testimony is that he viewed Elder's absences on October 6, 7, 8, 9, and 12 to be without a doctor's excuse.  According to Tapley, he heard nothing from Elder during this time frame about any reason to be absent from work.

## DISCUSSION

Congress enacted the FMLA to assist families in balancing the demands of the workplace with the needs of the family and to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition.  *See* 29 U.S.C. § 2601(b) (2009).  To that end, a covered employer must allow an eligible employee to take a total of twelve work weeks of leave during any twelve month period for one of several enumerated reasons.  *See* 29 U.S.C. § 2612(a) (2009).  The employer is not required to pay the employee for FMLA leave.  *See* 29 U.S.C. § 2612(c) (2009).  The FMLA further provides that subject to certain exceptions which the parties have not argued apply in this case,

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave – (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1) (2009).  The FMLA permits employers to require employees on leave "to report periodically to the employer on the status and intention of the employee to return to work."  29 U.S.C. § 2614(a)(5) (2009).  Moreover, employers are entitled to require that the need for leave be supported by the certification of a health care provider.  29 U.S.C. § 2614(a)(4) (2009).

It is unlawful for any employer to interfere with, restrain, or deny the exercise, or the attempt to exercise, any right provided by the FMLA.  29 U.S.C. § 2615(a)(1) (2009).  This

provision not only proscribes discriminatory treatment, but also prohibits failure to comply with the FMLA's prescriptive provisions such as the section requiring an employer to allow for leave in the enumerated circumstances and for reinstatement after leave. *See, e.g., Strickland v. Water Works & Sewer Bd. of the City of Birmingham,* 239 F.3d 1199 (11th Cir. 2001) (holding that district court erred by construing claim solely as a retaliation claim where plaintiff claimed his termination while on leave constituted both retaliation and a denial of his right to reinstatement under the FMLA); *Peters v. Cmty. Action Comm., Inc. of Chambers-Tallapoosa-Coosa,* 977 F. Supp. 1428, 1433 (M.D. Ala. 1997) (explaining the protections available under the prospective and prescriptive provisions of the FMLA).

To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that her employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1) (2009), and retaliation claims, in which an employee asserts that her employer discriminated against her because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2) (2009).[12] To state a FMLA claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000). To the contrary, to succeed on a FMLA retaliation claim, an employee must demonstrate that her employer intentionally discriminated against him in the form of

---

[12] The Eleventh Circuit has clarified that "[w]hile the FMLA does not clearly delineate these two claims with the labels 'interference' and 'retaliation,' those are the labels courts have used in describing an employee's claims under the Act." *Strickland,* 239 F.3d at 1206 n.9 (citation omitted).

an adverse employment action for having exercised an FMLA right. *See Strickland,* 239 F.3d at 1207 (delineating between the two forms of FMLA claims).  "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id*. (citation omitted).  These two types of FMLA claims, however, can be asserted simultaneously.  *Id*. (holding that district court erred by construing claim solely as a retaliation claim where plaintiff claimed his termination while on leave constituted both retaliation and a denial of his right to reinstatement under the FMLA); *Peters,* 977 F. Supp. at 1433 (explaining the protections available under the prospective and prescriptive provisions of the FMLA).  Elder follows this precedent and asserts both interference and retaliation claims under the FMLA.

## A.  Interference Claim

There is no dispute in this case that D&J is an employer within the scope of the FMLA's coverage or that Elder was eligible for FMLA leave by virtue of his time worked in the period calendar year.  Furthermore, for purposes of this motion, D&J does not dispute that Elder suffered from a serious health condition within the meaning of the FMLA.  Thus, the issue before this Court is an issue as to whether Elder gave proper notice of his need for leave.

An employee in need of FMLA leave must provide his employer with notice of the need for leave.  If the need for the leave is foreseeable, then the employee must, if practicable give no less than thirty days' notice before the date the leave is to begin.  *See* 29 U.S.C. § 2612(e)(2)(B) (2009); 29 C.F.R. § 825.302(a) (2009).  Where, as here, the need for leave is

not foreseeable, notice to the employer must be given "as soon as practicable under the facts and circumstances of the particular case." *See* 29 C.F.R. § 825.303(a) (2009). The Eleventh Circuit Court of Appeals has held that "where an employee's need for FMLA leave is unforeseeable, the employee need only provide her employer with notice sufficient to make her employer aware that her absence is due to a potentially FMLA-qualifying reason." *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005) (citation omitted). Generally, it is expected that under these circumstances, an employee will provide notice within no more than one or two working days of learning the need for the leave. 29 C.F.R. § 825.303(a) (2009).

Notice to the employer may be given in person or by other means, including fax or telephone. 29 C.F.R. § 825.303(b) (2009). In giving notice of the need for leave, the employee need not expressly invoke the FMLA or mention it at all; rather, if the employee states that "leave is needed," the employer will thereafter be expected to obtain any additional required information through informal means." *Id.; see Stickland*, 239 F.3d at 1209 (recognizing that once notice has been given, the "regulations place on the employer the burden of ascertaining whether the employee's absence actually qualified for FMLA protection.")

Due to the procedural posture of this case, the Court must view the facts properly presented in the light most favorable to Elder, the person against whom summary judgment is sought. When the Court views the facts in this fashion, it is clear that a reasonable jury could find that Elder timely put his employer on notice of his need for FMLA leave. Elder

18

gave Tapley notice that he was going to need FMLA leave because of the need for a variety of tests associated with his Rheumatoid Arthritis and the treatment he had received for it. This notice was provided when his wife called Harrell on September 28 and when Elder spoke to Tapley on September 30.  Moreover, according to Elder, he also talked to Tapley on October 6, 2009 and provided further notice that even after the testing was completed he was too sick to work until he got back on his medication.   Taken in conjunction with the written communications from *both* Dr. Abrams and Dr. Massey, the Court finds that Elder provided adequate notice of his need for FMLA leave from late September through October 12, 2009, the date on which Tapley terminated his employment.  Given Tapley's response to Elder during these conversations and his past practice of not enforcing the Attendance policy to the letter, Elder had no reason to suspect that the notice he was providing was inadequate.  It is undisputed that D&J denied Elder FMLA leave for the week of October 6 and fired him when he did not report to work on those dates.  In the rather unique circumstances of this case, the Court cannot find that D&J has established that the undisputed facts entitle it to judgment as a matter of law.  Accordingly, its motion is due to be DENIED with respect to the interference claim.

## B.  Retaliation Claim

In Elder's final claim, he contends that D&J violated the FMLA's anti-retaliation provision when it terminated his employment on the basis of his having invoked his rights under the FMLA and having taken leave because of his serious health condition.  "Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the

employer's retaliatory intent, [courts] apply the burden shifting framework established by the

Supreme Court in *McDonnell Douglas Corp. v. Green*." *Hurlbert v. St. Mary's Health Care

Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted).

> To establish a prima facie case of retaliation, the plaintiff must show that: (1)
> he engaged in statutorily protected activity; (2) he experienced an adverse
> employment action; and (3) there is a causal connection between the protected
> activity and the adverse action.  It the plaintiff makes out a prima facie case,
> the burden then shifts to the defendant to articulate a legitimate reason for the
> adverse action.  If the defendant does so, the plaintiff must then show that the
> defendant's proffered reason for the adverse action is pretextual.

*Id.* (internal citations omitted).

Elder has offered sufficient evidence to establish a prima facie case of retaliation.

With regard to the first element, it is undisputed that Elder contacted his employer asking to

take FMLA leave.   There is evidence from which reasonable jurors could conclude that he

took time off work on account of a serious health condition that prevented him from being

able to perform his job with D&J and that D&J knew that Elder's doctor had excused him

for certain days for testing and then also during flare-ups of his condition.   If Elder's

testimony is credited, then a reasonable jury could also find that Tapley also knew that Elder

was suffering from a flare-up during the week of October 6 because he had been off his

medication for testing of his liver.   Termination of employment is an adverse employment

action. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000), *cert.

denied*, 532 U.S. 1037 (2001).   The close temporal proximity between Elder's request for

FMLA leave and the termination of his employment constitutes sufficient circumstantial

evidence to create a genuine issue of material fact as to causation. *See, e.g., Hurlbert*, 439

F.3d at 1297-98; *Snelling v. Stark Props., Inc.*, No. 5:05CV46DF, 2006 WL 2078562 at *14-*15 (M.D. Ga. July 24, 2006).

D&J proffers as its legitimate, non-retaliatory reason for terminating Elder's employment his failure to call in sick to work beginning October 6, 2009. When the facts are viewed in the light most favorable to Elder, he has offered sufficient evidence to create a jury question as to whether this proffered reason is a pretext for retaliation. In considering this issue, the Court must credit Elder's testimony that he spoke to Tapley on October 6, 2009 and told him that he would continue to have to be out because he was sick with a flare up from being off his medicine. Moreover, Tapley's statements in his email to Harrell and in his phone conversations with Elder could be found by a reasonable jury to suggest that the owners of the company were pressuring Tapley to get rid of Elder because he was costing the company too much money with his frequent absences from work, many of which may have been FMLA qualified. Accordingly, the Court must DENY the motion with respect to this claim as well.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Motion for Summary Judgment (Doc. # 11) filed by D&J is DENIED.

DONE this the 10th day of February, 2011.

       /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE
